Cite as 2021 Ark. App. 306

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-19-913

| | |
|---|---|
| DRAGAN VICENTIC, INDIVIDUALLY AND AS A MEMBER, DIRECTOR, AND OFFICER OF GREEN SPRINGS MEDICAL, LLC<br><br>APPELLANT<br><br>V.<br><br>BRUCE SIMPSON<br><br>APPELLEE | **Opinion Delivered:** June 2, 2021<br><br>APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26CV-19-1211]<br><br>HONORABLE TED CAPEHEART, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Dragan Vicentic, individually and as a member, director, and officer of

Green Springs Medical, LLC, brings this interlocutory appeal challenging the Garland

County Circuit Court's order granting a preliminary injunction in favor of appellee Bruce

Simpson. Appellant contends that the circuit court erred in granting the injunction because

Simpson failed to prove that he was a member of Green Springs Medical, LLC, and that the

alleged harm Simpson would suffer was not irreparable. We affirm.[1]

Appellee filed a complaint against appellant on September 9, 2019, alleging that he

was a member and 40 percent owner of Green Springs Medical, LLC (Green Springs), a

---

[1]This is the second time this case has been before us. We initially ordered rebriefing due to briefing deficiencies. *See Vicentic v. Simpson*, 2021 Ark. App. 106.

medical-marijuana dispensary located in Hot Springs, Arkansas. He alleged, among other things, that no operating agreement was ever prepared or entered into by him; that there was no operating agreement entered into among all the members of Green Springs as to the conduct of the business and affairs of the LLC; and that since there was not a valid operating agreement, he was entitled to his contributions to capital, to share equally in the profits and assets remaining after all liabilities, and to interim distributions. Appellee alleged six causes of action against appellant: deceit, breach of contract, conversion, breach of fiduciary duty, promissory estoppel, and a statutory cause of action for profits and distributions held in trust. He sought relief in the form of damages, an accounting, injunctive relief, application to member's unlimited-liability interest with unsatisfied amount of judgment, and attorney's fees. Appellee specifically requested a jury trial. Exhibits were also included with appellee's complaint showing (1) the August 18, 2017, articles of organization for Green Springs, listing appellant as the agent, incorporator, and organizer; (2) the August 25, 2017, application for the medical-marijuana dispensary, listing appellant as CEO, board chairman, and 60 percent owner and listing appellee as security manager, vice chairman, and 40 percent owner; and (3) an undated Schedule "A" listing both parties as members and showing each party's contribution and ownership interest, which bares appellant's signature but not appellee's signature.[2] It was appellee's contention that since all members did not sign the operating agreement, the Small Business Entity Tax Pass Through Act came into effect by

---

[2]It was revealed that the Schedule "A" was actually a part of the operating agreement signed only by appellant.

default.[3]    Appellee relied on Arkansas Code Annotated section 4–32–503[4] to support his position that he should share equally in the profits of Green Springs after contributions to capital are repaid.  He also relied on section 4–32–601[5]  to contend that he should also share equally in the interim distributions of Green Springs.

In appellee's request for injunctive relief, he contended that appellant should be enjoined (1) from refusing to distribute all profits equally with him, (2) from deciding anything connected with the business of Green Springs without his affirmative consent, and (3) from preventing him from having access to the Green Springs premises and company records.  A hearing on appellee's request for a preliminary injunction took place on October 7.

Appellant testified that Green Springs was organized by his accountant.  He stated that initially, appellee was a member of Green Springs but that appellee's membership in Green Springs ceased around June 9 or 10.  He admitted that he did not have anything in

---

[3]The Act was codified at Arkansas Code Annotated §§ 4–32–101 et seq. (Repl. 2016). This Act was repealed during this year's legislative session and replaced by the Uniform Limited Liability Company Act, 2021 Ark. Acts 1041.

[4]Unless otherwise provided in writing in an operating agreement, each member shall be repaid that member's contributions to capital and share equally in the profits and assets remaining after all liabilities, including those to members, are satisfied.

[5]Except as otherwise provided in §§ 4–32–602 and 4–32–905, distributions of cash or other assets of a limited liability company shall be shared among the members and among classes of members in the manner provided in writing in an operating agreement. If an operating agreement does not so provide in writing, each member shall share equally in any distribution. A member is entitled to receive distributions described in this section from a limited liability company to the extent and at the times or upon the happening of the events specified in an operating agreement or at the times determined by the members or managers pursuant to § 4–32–403.

writing reflecting that appellee's membership had ended but said that it was verbally agreed that appellee would no longer be a member. He testified that when the application for the dispensary was filed, only he and appellee were shown to have ownership interests in Green Springs. Appellant testified that despite appellee's contention, there was an operating agreement for Green Springs that he signed in his capacity as managing member. He indicated that there did not seem to be room for anyone else to sign. He stated that he could not produce an operating agreement bearing appellee's signature. He testified that Schedule A did have an additional signature line, but appellee did not sign it. Appellant admitted that he filed a Medical Marijuana Commission change-of-information form on August 1 reflecting that he was now 100 percent owner of Green Springs; however, he was notified via email that the requested change would not be honored because there was no proof that the change was consensual or had been accomplished through judicial process. He stated that he received a letter from appellee's attorney prior to the complaint being filed demanding that he get in compliance with Arkansas Beverage Control (ABC) requirements. He acknowledged that he received a visit from ABC by way of a general inspection on July 17 and subsequently received notice of five violations. He stated that the matter was currently scheduled for a hearing. He said that he purchased several online plans to help him formulate the plan used in Green Springs' application. He stated that the plan included an advisory board, which has never met. He also said that of the six original board members,[6] only three remained. He said that appellee left June 9 and that Stafford and

_____

[6]The six original board members included appellant (CEO/board chairman); appellee (security manager/vice chairman); Keith Stafford (COO); Larry Stidman (CFO); Denise

4

Rivkees never came. He testified that Stidman is still on the board and that Wolfe is now the pharmaceutical consultant. Appellant stated that the business is successful; however, he declined to estimate Green Springs' profits. He also declined to say where the profits were being held due to security issues.

On cross-examination, appellant stated that he is listed as permittee on Green Springs' medical-marijuana permit. He said that he spent numerous hours doing research in anticipation of submitting the application for the dispensary. He also stated that he spent $7,500 for the permit, which eventually went toward the $25,000 license. He testified that he also had to secure property, which met the guidelines, as part of the application process. He testified that his family's trust purchased the property and building on which Green Springs is located for $350,0000 and that Green Springs pays rent on the property. He testified that he has a lot of real estate experience and that he owns two shopping centers in Hot Springs. Appellant stated that appellee did not contribute time, assistance, or finances toward the application process. He said that over two years passed between the time he filed the application and when the dispensary opened in May 2019. He denied having legal training and admitted that he had never heard of the Arkansas Small Business Entity Tax Pass Through Act of 1993. He also claimed not to know the statutory definition of a member of an LLC. He testified that he had read over the allegations in appellee's complaint and found all of them to be untrue. He stated that Green Springs had to follow all the applicable rules and regulations to open. Appellant said that appellee worked for Green

Rivkees, P.D., Ph.D (pharmacist consultant/board member); and Jonathan J. Wolfe, Ph.D-(board member).

5

Springs approximately two weeks after it opened on May 12. He testified that since he signed the operating agreement, it was valid as between him and Green Springs and resulted in him being the sole member. He stated that he did not understand that appellee would have an equity or ownership interest in Green Springs. According to appellant, appellee would receive a distribution as long as he was offering security services to Green Springs. He said that to him, a member was an employee, not someone who is a party to the operating agreement. Appellant introduced May's sales report and distribution which reflected that appellee had received 28 percent of the profits for that month.[7] Appellant stated that appellee did not object to receiving only 28 percent of the profits. He stated that the members or employees were paid percentages of the profits as long as they performed services for Green Springs. He stated that he had invested over a million dollars in Green Springs as well as countless hours. Appellant said that appellee made no capital investment in Green Springs. He stated that it was his understanding, based on the representations made in the application, that appellee would receive 40 percent while he was employed at Green Springs. Appellant discussed several incident reports he made against appellee the two weeks appellee worked for Green Springs. He said that following one incident, he offered appellee money to leave. He denied that it meant appellee had an equity interest in Green Springs, he just wanted appellee to leave. He stated that after appellee told a lobby full of customers that he was hired to shoot people, he took appellee into the office and

---

[7]Appellant received his 60 percent profit, but all other percentages of profits seem to have come out of appellee's 40 percent, including an additional 5 percent to appellant as sales manager.

informed appellee that his personality and "toxic attitude" were inappropriate for Green Springs. He said that appellee agreed that, due to problems with his health, he should leave.

On redirect, appellant stated that appellee never had a 40 percent ownership interest in Green Springs despite that information being included in the application to the Medical Marijuana Commission. He denied having a document signed by appellee showing that appellee's interest is less than 40 percent. He testified about an agreement that all the other employees' profit percentages would come out of appellee's 40 percent. He admitted that the five violations he received from ABC covered numerous counts, including forty-seven counts of failure to properly label marijuana. Other violations included the failure to maintain video-surveillance systems, failure to maintain biometric locks, failure to restrict access to limited access areas where marijuana is stored, and the posting of banners. He said that he could not estimate the profits and that he did not have that information with him.

On recross, appellant stated that he is strongly motivated for Green Springs to remain a licensed business. He denied being careless with operating profits from Green Springs and stated that he did not "need the money from Green Springs to live" as he has four other businesses. He stated that he doubted he would have any problems paying any type of judgment against him.

Appellee testified that appellant contacted him and asked if he would help appellant obtain a license for a medical-marijuana dispensary. He stated that he agreed to put forth a security plan and established a security company to handle the security needs of Green Springs. He said that as a result, he became the security manager for Green Springs. He testified that he helped with finding members of the board, including Rivkees and Wolfe.

He stated that he also assisted in the construction phase by installing all the security bars on the front of the building. He testified that he was never asked to contribute money but that he did invest money to start the security company. He said that he also paid workers to assemble the furniture located in Green Springs. Appellee stated that appellant systematically got rid of all the board members and stated that they did not need them after the application had been secured. He said that by June 10, only he and Wolfe remained as board members and that he is under the impression that Wolfe subsequently left also. He stated that anytime he inquired about something concerning Green Springs, appellant would tell him to go sit in his chair, watch people, and keep his mouth shut. He testified that he was concerned about the ABC violations and that when he was there, appellant's son would go into the vault at least twice a day and fill his backpack with something and leave. He stated that he always considered himself a 40 percent owner and as such, he is concerned that Green Springs is not making good on its promises to the Commission, and he fears that certain activities can jeopardize its license. He said that he would like to be able to return to the premises and see the day-to-day operations and ensure that no criminal activity is taking place. He also wants to be able to look at the books and receive an accounting of the business. He opined that Green Springs has a monthly profit of between $300,000 and $400,000, and he claims he is entitled to 40 percent of that money. He testified that he wants to receive an accounting of all the money and product that has passed through Green Springs, and he also wants his share of the distributions. He said that it is unfair for appellant to take an additional 5 percent out of his 40 percent or to receive a share of the profits when he is being denied his share. He stated that he would also like to be consulted and his

consent sought for any business transactions involving Green Springs. He testified that he believed that the incident reports were manufactured by appellant to tarnish his reputation. He said that he is not concerned about being able to obtain a judgment against appellant, but he worries about being able to collect on a large judgment. He denied ever giving up his interest in Green Springs. He testified that appellant offered to buy him out, but he refused to accept $100,000.

On cross-examination, appellee stated that he never signed an operating agreement for Green Springs. He could not explain why his complaint included Schedule A from the operating agreement but not the rest of the agreement and said that he would have to ask his attorney. He stated that he and appellant got along well until he alleged that appellant was not managing Green Springs properly. He admitted that he planned to use his security company to provide security at other marijuana dispensaries. He said that appellant quit paying the security company after June 10. Appellee denied ever transferring, selling, or otherwise using the interest he has in Green Springs. He stated that he talked to appellant about being approached about selling the business and appellant indicated that they would "never sell out." He stated that he respected appellant's decision because appellant was 60 percent owner as compared to his 40 percent ownership.

On redirect, appellee stated that even though he has contended that he has a 40 percent ownership interest in Green Springs, he wants the relief he is entitled to under the statute, which is 50 percent.

On recross, appellee stated that he questioned appellant after he received the May distribution report because he was receiving less than his 40 percent. He denied that he had

agreed that the other salaries would be paid from his percentage. He stated that he felt the action was fraudulent, so he asked for an accounting. He said that in response to his request, appellant told him to "[g]o sit in [his] chair."

After hearing arguments of counsel, the court tentatively ruled that there was no operating agreement; that appellee initially had a 40 percent interest in Green Springs, which was never given or taken away; that based on the statute, appellee is entitled to 50 percent of Green Springs's profits. The court also stated that appellee should have a say in all important decisions made by Green Springs and that he should have access to all the books and records through his accountant, designated lawyer, or representative. When asked about irreparable harm, the court responded that there is no telling what will happen at Green Springs if there is not some supervision over appellant. It also noted the fact that appellant had already secretly tried to remove appellee's name from the business.

The court entered an order on November 4, essentially outlining its oral ruling. It stated in pertinent part:

> 1. The testimony is undisputed that Mr. Simpson had a forty percent interest and Mr. Vicentic had a 60 percent interest in Green Springs Medical, LLC ("the LLC"). Simpson's interest was not taken away and it was not given away, and Simpson continues to have an interest in the LLC.
>
> 2. Although Mr. Simpson was and is a member of the LLC, his signature does not appear on an operating agreement setting forth the ownership interests of the members. Upon application of the Small Business Entity Pass Through Act of 1993 (The Act) legislating the creation and operation of limited liability companies, Simpson's membership interest in the LLC is 50 percent.
>
> 3. It is likely that Simpson's membership claim will prevail at trial.
>
> 4. This order is necessary to preserve and protect Simpson's membership interest and there is a serious risk that irreparable harm will occur without the benefit

of this Order.  Vicentic has already attempted to remove Simpson from the LLC in a surreptitious manner and, without supervision, irreparable harm will likely occur. 5.  Under the Act, Simpson's consent is required for any transactions connected with the conduct of the LLC.  Simpson is also entitled to inspect and copy any records of the LLC.

.  .  .  .

7. Based on the evidence presented at preliminary hearing, Simpson is entitled to 50 percent of the past and future profits.  However, awarding damages at this time is not appropriate under the law.  Therefore, to preserve and protect his interest in said profits the Court should order and direct that one half of the monthly profits should be deposited by Vicentic into a state banking institution before the second Monday of each month after profits are made.

The order also listed a set of protocols to facilitate appellee's consent and access without his going onto Green Springs' premises.  Appellant filed a timely notice of appeal the same day. The order was subsequently amended on November 20 after appellee filed a motion indicating that the bank would not accept the funds.  Everything remained the same in the amended order except the place where the funds were to be deposited.  The amended order stated that the funds were to be deposited into the registry of the court.  Appellant filed an amended notice of appeal on December 2.  This interlocutory appeal followed.

In determining whether to issue a preliminary injunction pursuant to Arkansas Rule of Civil Procedure 65, the circuit court must consider two issues: (1) whether irreparable harm will result in the absence of an injunction or restraining order and (2) whether the moving party has demonstrated a likelihood of success on the merits.[8]  The appellate court reviews the grant of a preliminary injunction under an abuse-of-discretion standard.[9]  In

---

[8]*City of Jacksonville v. Smith*, 2018 Ark. 87, 540 S.W.3d 661.

[9]*Id.*

11

considering an appeal of an order granting a preliminary injunction, the appellate court will not delve into the merits of the case further than is necessary to determine whether the circuit court exceeded its discretion in granting the injunction.[10] The sole question before the appellate court is whether the circuit court departed from the rules and principles of equity in making the order and not whether the appellate court would have made the order.[11]

As his first point on appeal, appellant contends that the circuit court erred in granting the injunction because appellee failed to prove that he was a member of Green Springs Medical, LLC, because he did not sign the operating agreement, and membership in Arkansas requires a valid written operating agreement. Arkansas Code Annotated section 4–32–102 (10)[12] defines a member as "a person or persons who have been admitted to membership in a limited liability company as provided in § 4–32–801[13] and who have not ceased to be members as provided in § 4–32–802.[14] An operating agreement is defined by

---

[10] *Id.*

[11] *Id.*

[12] (Repl. 2016).

[13] (a) Subject to subsection (b) of this section, a person may become a member in a limited liability company:

(1) In the case of a person acquiring a limited liability company interest directly from the limited liability company, upon compliance with an operating agreement or, if an operating agreement does not so provide in writing, upon the written consent of all members[.]

[14] A person can cease being a member for several reasons, including death, removal, voluntary withdrawal, etc.

subsection (11) as "the written agreement which shall be entered into among all of the members as to the conduct of the business and affairs of a limited liability company." Appellant contends that since membership in Arkansas requires a written operating agreement, and since appellee did not sign the operating agreement, he is not a member of Green Springs. This argument fails mainly because, even though a written operating agreement is required, Arkansas Code Annotated §§ 4-32-101 et seq. provide for situations in which, although there is an operating agreement, all members have not signed such an agreement. This is exactly the situation we have here. Appellant signed the operating agreement as managing member, but appellee was never presented with the agreement and never had an opportunity to sign the agreement. It is undisputed that when Green Springs was formed, appellant had a 60 percent ownership interest and appellee had a 40 percent interest. Despite those being the interests as contemplated by the parties, the statute kicked in because all members, i.e., appellee, did not sign the operating agreement thereby making the agreement signed by appellant invalid for purposes of the statute. Because there is no valid operating agreement outlining what percentage of the profits each member takes, appellant and appellee are to share the profits equally. Appellant contends that the operating agreement is valid as it pertains to him and that appellee was never a member of Green Springs. This statement is in direct contradiction to appellant's testimony at the hearing in which he testified that initially, appellee was a member. He also stated that there was room for only one signature on the operating agreement, so he signed in his capacity as managing member. Additionally, in the application for the dispensary, appellant indicated that appellee held a 40 percent interest in Green Springs, and there was nothing presented to the circuit

13

court showing that appellee's interest had been dissolved. It can also be argued that by naming appellee as an owner during the application process, appellant gave written consent that appellee was, in fact, a member. Additionally, if appellee's testimony about appellant attempting to buy him out is true, this is inconsistent with appellant's contention that appellee was never a member and never held any interest in Green Springs besides that of an employee. Appellant argues that owner and member are not the same; however, we need not delve any further into the merits of this case. Our only inquiry here is whether the circuit court abused its discretion by finding that appellee was likely to succeed on the merits that he was, in fact, a member of Green Springs. We hold that the circuit court did not abuse its discretion in making such a finding. Accordingly, we affirm on this point.

Next, appellant argues that the circuit court erred in granting the injunction because any damage suffered by appellee is reparable. Irreparable harm is the touchstone of injunctive relief.[15] Further, we have said that harm is normally considered irreparable only when it cannot be adequately compensated by money damages or redressed in a court of law.[16] Here, although appellee sought monetary damages, he also sought the right to participate in the business decisions of Green Springs and the right to inspect the inventory, records, and books of Green Springs. He made allegations that there was possible criminal activity taking place at Green Springs that could possibly put the business itself in jeopardy. The court seemed to agree that appellant needed oversight to ensure that Green Springs was

---

[15]*United Food & Com. Workers Int'l Union v. Wal-Mart Stores*, Inc., 353 Ark. 902, 120 S.W.3d 89 (2003).

[16]*AJ & K Operating Co., Inc. v. Smith*, 355 Ark. 510, 140 S.W.3d 475 (2004).

being run within the bounds of the law, and it expressed concerns over appellant's going behind appellee's back to try to remove appellee's name as an owner. The harm appellee faced if the injunction was not granted could not necessarily be compensated by money damages or redressed in a court of law. Accordingly, we hold that the circuit court did not abuse its discretion in finding that appellee would suffer irreparable harm if the injunction was not issued. Therefore, we affirm.

Affirmed.

GLADWIN and VAUGHT, JJ., agree.

*Culpepper Law Firm, PLLC*, by: *Ryan K. Culpepper*, for appellant.

*Gary M. Lax* and *D. Scott Hickam*, for appellees.